

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 2-07-236-CV

IN THE INTEREST OF L.A., A.R., S.A.H.,
AND D.S.L.H., CHILDREN

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Appellants Latacha R. and Byron H. appeal from the trial court's order terminating Latacha's parental rights to her four children, L.A., A.R., S.A.H., and D.S.L.H., and Byron's rights to his two children, S.A.H. and D.S.L.H. We affirm.

---

[1] *See* TEX. R. APP. P. 47.4.

**Factual and Procedural Background**

L.A., A.R., S.A.H., and D.S.L.H. are ten, seven, five, and four years of age, respectively. Latacha is the biological mother of all four children. Byron is the biological father of S.A.H. and D.S.L.H. Latacha is married to Izell R.[2] Latacha and Izell separated in May or June of 2002. Latacha met Byron in early 2002, and they began living together in the summer of 2002.

L.A. suffers from what one psychologist diagnosed as mild mental retardation, and she has an IQ of 63.[3] In 2002, when L.A. was four years old, she made a sexual abuse outcry to her maternal grandmother, Estella B. Estella testified that L.A. told her that Byron had touched her "goochie" or privates. About a week later, L.A. moved in with Estella's son, Devarius B., and his girlfriend, Natasha G., in Austin. Natasha testified that L.A. told her that her "goochie" hurt, that Byron hurt her, and that she did not want to go back to the "blue house" where Byron lived. Natasha and Devarius took L.A. to a Child Advocate Center. The Department eventually "ruled out" the allegation for physical abuse and sexual abuse.

---

[2] Izell is the presumed father of A.R., S.A.H., and D.S.L.H. The trial court terminated Izell's parental rights, and Izell did not appeal the trial court's order.

[3] But L.A.'s special-needs teacher testified that L.A. scored a 74 on another IQ test, which is four points above the cutoff for mental retardation.

2

Eric Franklin, the supervisor of investigations for Travis County Child Protective Services, testified that the Department received four other referrals for the family in the eight months after December 2002. In February 2004, the Department received a risk referral regarding allegations that Byron had sexually abused his ten-year-old biological daughter, who lived in Montana. In May 2004, the Department received another referral regarding Byron's abuse of one of L.A.'s younger siblings. The Department recieved two more referrals in 2005 for physical abuse and physical neglect.

In July 2006, Byron's mother, Salome H., received a voicemail message on which she thought she heard L.A. crying out for help (a Department caseworker testified that subsequent analysis of the voicemail showed Salome's interpretation to be unfounded). Concerned about L.A.'s and the other children's safety, Salome retrieved all four children from Byron's home. L.A. told Salome that "my daddy took me in the bedroom and pulled my pants down, . . . he had a long brown thing between his legs, and he put it in my butt." Salome reported L.A.'s outcry to the police. In a videotaped interview, L.A. told a Department investigator that Byron told her to bend over and that he "poked" her "bottom" with an object she called a "ranus." When asked by the Department interviewer to draw a picture of Byron and his penis, she drew the penis separate and detached from his body. Latacha consented to a search

3

of the apartment she shared with Byron, and in the apartment police found and photographed a vibrator and a dildo. The trial court admitted the photographs into evidence over Latacha's and Byron's objections. Dr. Jamye Coffman, director of the child abuse program at Cook Children's Medical Center, testified that L.A. told her that her daddy "put his penis in [her] butt"; that her mom was just standing there watching; that she told her mom that it hurt, but her mom didn't do anything; and that she passed blood with a bowel movement afterwards.

Based on L.A.'s outcry, the Department removed the children and placed them with Byron's mother. The State charged Byron with sexually assaulting L.A. in 2002, and Byron remained in jail awaiting trial when the termination case went to trial. A jury found that Latacha and Byron had endangered the children and that termination was in the children's best interest, and the trial court terminated their parental rights.

4

**Discussion**

**1. Admission of photographs of sexual device**

Latacha, in her first issue, and Byron, in his second issue, both argue that the trial court erred by admitting into evidence two photographs of the dildo police found in their apartment because the danger of unfair prejudice substantially outweighed the photograph's probative value.

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence. TEX. R. EVID. 403. A Rule 403 analysis should include consideration of (1) how probative the evidence is; (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence. *Shuffield v. State,* 189 S.W.3d 782, 787 (Tex. Crim. App.), *cert. denied*, ___ U.S. ___ (2006). When considering photographs admitted over a Rule 403 objection, the reviewing court should also consider the number of photographs, the size of the photographs, whether they are in color or black and white, and the detail shown in the photographs. *Id.* (also listing considerations not applicable here).

5

The admissibility of photographs over a challenge is within the sound discretion of the trial court. *In re J.B.C.*, 233 S.W.3d 88, 94 (Tex. App.—Fort Worth 2007, pet. denied). Because Rule 403 favors admissibility of relevant evidence, the presumption is that relevant evidence will be more probative than prejudicial. *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1990) (op on reh'g). The burden is on the opponent of the proffered evidence to demonstrate the prejudicial attributes of the evidence and to show how these attributes substantially outweigh the probative value of the evidence. *Goldberg v. State*, 95 S.W.3d 345, 367 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd), *cert. denied*, 540 U.S. 1190 (2004).

In this case, the photographs of the dildo found in Latacha and Byron's apartment was probative evidence that supported L.A.'s outcry that Byron had penetrated her anus with an object she described as a "ranus." The photographs certainly had the potential to impress the jury in a way that was unfavorable to Latacha and Byron and possibly indelible, but we cannot say that the impression so formed would be irrational, particularly in a case where a key question for the jury was the credibility of L.A.'s testimony that she had been sexually assaulted with a foreign object. The Department spent little time developing the evidence. As both Latacha and Byron point out, there was ample testimony about L.A.'s outcry that she had been sexually assaulted with

6

a "ranus," and a police officer described finding the dildo, but the testimony was inadequate to describe the device itself; this case proves the time-worn cliché that a picture is worth a thousand words. Thus, the Department had a need for the evidence.

One of the photographs is approximately eight by ten inches and the other is approximately five by seven inches. The first photograph was taken outside a closet and depicts the areas both inside and outside the closet, and the dildo is just visible though the closet door. The second photograph presents a wide-angle view of the closet floor. In both photographs, the image of the dildo itself is occupies a small portion—less than one percent of the five by seven and about 1/10 of one percent of the eight by ten—of the whole photograph. The copies filed in this court are black and white; presumably, the original exhibits are in color, but neither Latacha nor Byron suggest that the color of the photographs presented a danger of unfair prejudice.

We hold that Latacha and Byron have failed to show how the photographs' prejudicial attributes outweighed their probative value and that the trial court did not abuse its discretion by overruling their Rule 403 objections. We overrule Latacha's first issue and Byron's second issue.

**2.  Legal and Factual Sufficiency**

Latacha, in her second issue, and Byron, in his third issue, challenge the legal and factual sufficiency of the evidence to support the jury's grounds-for-termination and best interest findings.  As grounds for termination, the jury found that Latacha violated paragraphs (D) and (E) of family code section 161.001(1) with regard to all four children and that Byron violated the same paragraphs with regard to S.A.H. and D.S.L.H.

**a.  Standard of review**

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).  In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit.  TEX. FAM. CODE ANN. § 161.206(b) (Vernon Supp. 2007); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.  *Holick*, 685 S.W.2d at 20–21; *In re E.M.N.*, 221 S.W.3d 815, 820 (Tex. App.—Fort Worth 2007, no pet.).

8

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish at least one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001 (Vernon Supp. 2007); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence. TEX. FAM. CODE ANN. §§ 161.001, 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006, pet. denied). It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2002).

When reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the fact-finder resolved any disputed facts in favor of its finding if a reasonable fact-finder could have done so. *Id.* We must also disregard all evidence that a reasonable fact-finder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the fact-finder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we must defer to the fact-finder's determinations as long as they are not unreasonable. *Id.* at 573.

When reviewing the evidence for factual sufficiency, we must give due deference to the fact-finder's findings and not supplant the verdict with our

10

own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the parent violated the relevant conduct provision of section 161.001(1) and that the termination of the parent's parental rights would be in the best interest of the child. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

### b. Endangerment as grounds for termination

Paragraph (D) of family code section 161.001(1) authorizes termination if a parent knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the child's physical or emotional well-being, and paragraph (E) authorizes termination if a parent engaged in conduct that endangers the child's physical or emotional well-being. TEX. FAM. CODE ANN. § 161.001(1)(D), (E).

Endangerment means to expose to loss or injury, to jeopardize. *Boyd,* 727 S.W.2d at 533; *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). Under subsection (D), it is necessary to examine evidence related to the

11

environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. *In re D.T.*, 34 S.W.3d 625, 633 (Tex. App.—Fort Worth 2000, pet. denied). Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *In re W.S.,* 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ). For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child. *See id*. at 776–77; *Ziegler v. Tarrant County Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.).

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re R.D.*, 955 S.W.2d 364, 368 (Tex. App.—San Antonio 1997, pet. denied); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 83–84 (Tex. App.—Dallas 1995, no writ). Additionally, termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. Tex. Fam. Code Ann. § 161.001(1)(E); *D.T.*, 34 S.W.3d at 634; *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.). Under

12

either subsection (D) or (E), it is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533.

Because the evidence concerning these two statutory grounds for termination is interrelated, we consolidate our examination of it. *See In re J.T.G,* 121 S.W.3d 117, 126 (Tex. App.—Fort Worth 2003, no pet.); *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied) (recognizing the link between a parent's conduct and a child's conditions and surroundings).

### i. Grounds for termination: Latacha

Latacha argues that the evidence is legally and factually insufficient to support the jury's paragraph (D) and (E) endangerment findings because she testified that she knew nothing about Byron's abusing L.A. Latacha testified that she did not learn of L.A.'s 2002 outcry until June 2003. She testified that when she did learn of L.A.'s outcry, she asked both L.A. and Byron about the alleged abuse; she testified that they both denied that anything had happened. On the other hand, Dr. Jamye Coffman testified that L.A. told her that Latacha watched as Byron abused her, that she told Latacha that it hurt, and that Latacha did nothing in response. We must defer to the jury's determinations of the credibility of the witnesses, the weight to be given the testimony, and the resolution of evidentiary conflicts. *City of Keller v. Wilson*, 168 S.W.3d

13

802, 819, 822 (Tex. 2005). A reasonable jury could have formed the firm belief or conviction that Latacha witnessed or knew about the abuse and did nothing to stop it. We therefore hold that the evidence is both legally and factually sufficient to support the jury's endangerment findings.

In addition, Daniel Green, a psychotherapist who provided counseling services to Latacha as part of her service plan, testified that she told him that she had "relapsed" and used marijuana and cocaine after the Department removed her children. Department caseworker Tikishia Lusk-Wilkerson likewise testified that Latacha tested positive for cocaine and marijuana a few months before trial and that Latacha said that she did not consider marijuana to be a drug. A parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, supports a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being. *In re R.H.*, No. 02-06-00130-CV, 2006 WL 3627176, at *4 (Tex. App.—Fort Worth Dec. 14, 2006, no pet.) (mem. op.); *In re J.J.O.*, No. 02-03-00267-CV, 2004 WL 966317, at *4 (Tex. App.—Fort Worth May 6, 2004, no pet.) (mem. op.). Latacha denied having used cocaine and testified that she only told Green that she had tested positive for cocaine, not that she had relapsed. Again, the jury was free to believe Green and Lusk-Wilkerson and disbelieve Latacha. *See City of Keller*, 168 S.W.3d at 819, 822. We hold that

14

the evidence of Latacha's drug use during the pendency of the termination suit is also legally and factually sufficient to support the jury's endangerment findings. We overrule the portion of Latacha's second issue that pertains to the jury's findings on grounds for termination.

### ii. Grounds for termination: Byron

Byron argues that the evidence is legally and factually insufficient to support the jury's endangerment findings because there is no evidence that he sexually abused his biological children, S.A.H. and D.S.L.H. It is beyond question that sexual abuse is conduct that endangers a child's physical or emotional well-being. *In re R.W.*, 129 S.W.3d 732, 742 (Tex. App.—Fort Worth 2004, pet. denied). Evidence of sexual abuse of one child is sufficient to support a finding of endangerment with respect to other children. *Id.* Most of the evidence at trial concerned the allegations that Byron sexually abused L.A. We therefore hold that the evidence was legally and factually sufficient to support the jury's endangerment findings with regard to Byron, and we overrule his third and fourth issues.

15

### c. Best interest

Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (Vernon 2002). There is also a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(1) the desires of the child;

(2) the emotional and physical needs of the child now and in the future;

(3) the emotional and physical danger to the child now and in the future;

(4) the parental abilities of the individuals seeking custody;

(5) the programs available to assist these individuals to promote the best interest of the child;

(6) the plans for the child by these individuals or by the agency seeking custody;

(7) the stability of the home or proposed placement;

(8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(9) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

### i.    Best interest:  Latacha

Ruth Ann Patsel, a court-appointed special advocate who attended some but not all of the supervised visitations, testified that she saw very little interaction between Latacha and the children during the visitations. Latacha appeared happy to see the boys but had little to do with the girls. She occasionally brought gifts for the children but usually for just the boys. She allowed S.A.H. to bully the other children and take toys away from them. Patsel testified that the girls were not strongly bonded to Latacha.

Caseworker Lusk-Wilkerson testified that Latacha refused to attend non-offender sexual abuse classes and was discharged from a CATS drug treatment program for noncompliance.

Jacqueline H.—Byron's aunt—testified that Latacha is doting, playful, and very affectionate towards the children. She said that the children cried for

17

Latacha when she was absent. Latacha's mother testified that Latacha is a caring and loving mother who can be protective. Byron's mother testified that the children were bonded to Latacha.

Latacha testified that she doubted that Byron sexually abused L.A. because Latacha's mother was living with them at the time of the alleged abuse; but she also admitted that she, herself, had been sexually assaulted as a minor when living in her mother's home and had ultimately been placed in foster care. Green, the psychologist who counseled Latacha, testified that Latacha was supportive of Byron and that she said she would stand by him until the State proved that he sexually abused L.A. Latacha said that she was no longer in a relationship with Byron and would not resume it if Byron were released from custody. She denied that the two had exchanged letters while Byron was in jail, but she later spoke of writing to him in jail. Latacha testified that she allows people with whom she is comfortable to be around her children, and she said she was comfortable around Byron.

Considering the evidence relevant to the *Holley* factors, we hold that a fact-finder could rationally have formed a firm belief or conviction that termination of Latacha's parental rights is in the children's best interest; therefore, the evidence is legally sufficient to support the jury's best-interest findings. Considering all of the evidence, including the evidence that

18

contradicts the jury's best-interest findings, we hold that it is also factually sufficient. We therefore overrule the remainder of Latacha's second issue.

### ii. Best interest: Byron[4]

Patsel testified that during supervised visitations, Byron had very little to do with the children and once spent three-quarters of a visitation reading a magazine. Lusk-Wilkerson testified that he refused to attend sex offender counseling classes. He attended only three parenting classes (due to lack of cooperation, not because his incarceration prevented his attendance) and did not submit to a psychological evaluation. Like Latacha, he was discharged from a CATS drug treatment program for noncompliance.

Latacha testified that prior to the children's removal, Byron was the main economic provider for the family. But when asked about his relationship with the children, she testified, "Really, he semi-played with them sometimes, but most of the time he was . . . in his back room messing with" his music records and turntables.

Considering all of the evidence relevant to the *Holley* factors, including the evidence that contradicts the trial court's best-interest findings, we hold that a fact-finder could rationally have formed a firm belief or conviction that

---

[4] Byron challenges only the factual sufficiency of the evidence to support the jury's best-interest findings.

19

termination of Byron's parental rights is in S.A.H.'s and D.S.L.H.'s best interest; therefore, the evidence is factually sufficient to support the jury's best-interest findings. We therefore overrule Byron's fifth issue.

**3.** **Denial of Byron's motion to appear in personal clothing and without restraints**

Byron—who was awaiting trial on sexual assault charges stemming from L.A.'s outcry—appeared throughout the trial of this case in a prison jumpsuit and leg shackles. In his first issue, Byron argues that the trial court abused its discretion by denying his motion to appear in personal clothing and without restraints. The Department tacitly concedes that the trial court erred by compelling Byron to appear in shackles and prison garb but argues that the error was harmless.

The issue of shackling a party during trial naturally arises more often in criminal cases. The United States Supreme Court has admonished that a criminal defendant should not be shackled in the sight of the jury except as "a last resort." *Illinois v. Allen*, 397 U.S. 337, 344, 90 S. Ct. 1057, 1061 (1970). Our court of criminal appeals has echoed that shackling should be avoided "except where there has been a showing of exceptional circumstances or a manifest need for such restraint." *Long v. State*, 823 S.W.2d 259, 282 (Tex. Crim. App. 1991), *cert. denied*, 505 U.S. 1224 (1992). A trial judge must set

forth with specificity the reasons supporting the decision to restrain the defendant. *Cooks v. State*, 844 S.W.2d 697, 722 (Tex. Crim. App. 1992), *cert. denied*, 509 U.S. 927 (1993).

Compelling a defendant to appear for trial in prison clothes is similarly disfavored. "If a defendant objects to being put to trial while dressed in prison clothes, he should not be compelled to stand trial in that attire." *Randle v. State*, 826 S.W.2d 943, 944–45 (Tex. Crim. App. 1992). Compelling a defendant to appear in jail clothes during trial bears the indicia of incarceration that subvert a defendant's right to a presumption of innocence. *Scott v. State*, 80 S.W.3d 306, 307 (Tex. App.—Fort Worth 2002, no pet.).

When a trial court erroneously compels a respondent in a parental-rights termination case to appear in shackles, the reviewing court must apply the harmless error rule. *In re K.R.*, 63 S.W.3d 796, 800 (Tex. 2001), *cert. denied*, 536 U.S. 941 (2002). "If the Fourteenth Amendment does not prevent the application of the 'harmless error' rule to shackling in criminal cases, then we do not see how it can be held to do so in civil cases, even those involving matters as important as the parent-child relationship." *Id.*

In *In re K.R.*, the trial court, without stating its reasons in the record, compelled the respondent father—who had been convicted of reckless injury to a child that resulted in the death of one of his two children—to remain

handcuffed throughout the parental-rights termination trial. *Id.* at 798. The trial court instructed the jury not to infer anything from the fact that the father was handcuffed other than the fact that he had been convicted of an unspecified crime requiring incarceration. *Id.* The supreme court applied the harmless error rule and concluded that "we must assume, absent any evidence to the contrary, that [the jury] could . . . follow the trial court's instruction and draw no improper conclusions from seeing [the father] sitting in handcuffs. Nothing in the record even hints that they would have reached a different verdict had they not seen [the father] in shackles." *Id.* at 800–01.

In this case, the trial court apparently considered and denied at a pretrial hearing Byron's motion to appear in street clothes and without shackles; there is no record of the hearing or the trial court's ruling. On the first day of trial, Byron briefly re-urged his motion to the visiting judge who tried the case. No other party offered argument on the motion, and the trial court denied the motion without explaining why exceptional circumstances or a manifest need justified Byron's restraint during trial. In the absence of any such explanation, and none being apparent from the record, we hold that the trial court erred by requiring Byron to appear in prison garb and shackles. *See Cooks*, 844 S.W.2d at 722.

22

We must now determine whether the error harmed Byron. *See In re K.R.*, 63 S.W.3d at 800. Unlike *In re K.R.*, the trial court in this case did not instruct the jury regarding what inferences it could or could not draw from the fact that Byron was shackled and wearing a jail jumpsuit. But during voir dire, his counsel made the following explanation to the panel:

> I guess we should talk about the elephant in the room before we go any further. My client is wearing a green jumpsuit. . . . My client has not been convicted of anything. He's not in, he's not in the Texas Department of Criminal Justice. He's not been convicted. He is innocent. He is, however, poor. He cannot make bail, so he sits here today in a green jumpsuit. . . . He's not had a criminal day in court, okay? That has not happened in this case. There has, however, been an accusation, and ultimately, . . . the reason we are here is because of that accusation. They do go hand in hand.

We have already considered the evidence presented at trial and determined that it is legally and factually sufficient to support the jury's verdict with regard to Byron's parental rights. As in *In re K.R.*, nothing in the record suggests that the jury would have arrived at a different verdict had they not seen Byron in shackles and jail garb. We therefore hold that the trial court's error in requiring him to do so was harmless, and we overrule his first issue.

**4.     Conclusion**

Having overruled all of Latacha's and Byron's issues, we affirm the trial court's termination order.

PER CURIAM

PANEL F:    GARDNER, J.; CAYCE, C.J.; and LIVINGSTON, J.

DELIVERED: May 22, 2008